**J.S., Appellant,**

**v.**

**CENTER FOR BEHAVIORAL HEALTH, Appellee.**

No. 53A04–0509–CV–563.

Court of Appeals of Indiana.

May 12, 2006.

Michael L. Jenuwine, South Bend, for Appellant.

## OPINION

SHARPNACK, Judge.

J.S. appeals the trial court's grant of a commitment and forced medication order sought by the Center for Behavioral Health ("CBH").[1] J.S. raises two issues, which we restate as:

I. Whether the evidence is sufficient to sustain the trial court's commitment order; and

II. Whether evidence is sufficient to sustain the trial court's forced medication order.

We affirm.

The relevant facts follow. J.S. is a forty-eight-year-old woman who has been diagnosed with a "psychotic disorder, not otherwise specified" with "many of the typical symptoms of schizophrenia, the paranoid type, but the diagnosis is complicated by the fact that she [has] a persistent uncontrolled epileptic disorder." Transcript at 71. As a teenager, J.S. was diagnosed with the seizure disorder that has required significant medical intervention. She was hospitalized as a result of her mental illness for the first time when she was sixteen years old and has been hospitalized at least four additional times. Approximately ten years ago, J.S. underwent surgery to remove a significant portion of her left temporal lobe in an effort to control her seizures. Additionally, J.S. had a vagus nerve stimulator implanted on February 23, 1998, which has improved her seizure control. However, "these types of epileptic formed seizures can produce psychotic symptoms on their own at times," and the surgery cannot "be completely excluded in the formation of the psychotic symptoms which she experiences." *Id.* J.S.'s seizure disorder is treated by a neurologist, Dr. Flint, and she receives mental health treatment from Dr. Jerry Neff at the CBH.

In 2001, J.S. was involuntarily committed after she refused to take her medicine because she believed that it had been poisoned and after she refused to eat and lost a significant amount of weight. Her mother was appointed as guardian in 2003. However, J.S.'s mother has deferred many of her responsibilities to the CBH.

In late 2003 and early 2004, J.S. again refused to eat because she thought that her food was being poisoned, and her CBH case manager found bottles of oral Risperdal that J.S. had not taken. Risperdal is a medication used to treat schizophrenia. In December 2003, J.S. became verbally aggressive with her case manager, would not let the case manager leave J.S.'s house, and "came within inches of [the case manager's] face and screamed and was threatening and verbally aggressive." *Id.* at 14–15. On January 15, 2004, CBH filed an application for an emergency detention, which was granted.

---

**1.** CBH failed to file an appellee's brief. When the appellee fails to timely file a brief, the appellant need only establish prima facie error to obtain reversal. *Serletic v. Noel,* 700 N.E.2d 1159, 1161 (Ind.Ct.App.1998); Ind. Appellate Rule 45(D). Prima facie, in this context, is defined as "at first sight, at first appearance, or on the face of it." *Serletic,* 700 N.E.2d at 1161. Thus, J.S. is only required to demonstrate prima facie error to obtain reversal.

On January 20, 2004, CBH filed a petition for a regular involuntary commitment, and a hearing was held on January 28, 2004. The trial court granted the petition for a regular involuntary commitment and found that J.S. was "suffering from severe seizure disorder/chronic paranoid schizophrenia, mental illness as defined in I.C. 12–7–2–130(1)," and that J.S. was "a danger is [sic] gravely disabled as defined in I.C. 12–7–2–96 and is in need of continuing care or treatment." Appellant's Appendix at 11. The trial court also found that J.S.'s "condition will deteriorate if she does not receive medication regularly and the benefits of the medication outweigh the possible side effects." *Id.* The trial court ordered that J.S. be committed to the Bloomington Hospital Med Psych Unit and ordered the hospital to administer medication to J.S. with or without her consent. *Id.*

J.S. started receiving injectable Risperdal Consta on January 15, 2004, to help control her symptoms of schizophrenia. J.S.'s mother, her guardian, was in favor of the recommitment. J.S.'s mother contacted Dr. Flint regarding the Risperdal injections, and he did not raise any objections to the medication.

At some point, J.S. was released from the hospital to her own apartment but was required to return to CBH every other week for a Risperdal Consta injection and meet with her CBH case manager weekly. Her dosage of Risperdal Consta was increased on May 17, 2004. Dr. Flint informed CBH on June 7, 2004, that J.S.'s seizure activity was well controlled and that the Risperdal had not made any differences in J.S.'s seizure activity.

The Risperdal Consta improved J.S.'s mental health. In fact, according to her mother, J.S. improved dramatically and was "managing her life real well." Transcript at 123. However, J.S. does not be-lieve that she is mentally ill and does not want to take antipsychotic drugs. During this time, J.S. was living in an apartment with her boyfriend, cleaned the apartment, cooked meals, refilled her prescriptions, scheduled her own doctor appointments, and arranged for transportation.

Between October 1, 2004 to January 28, 2005, J.S. did not receive her Risperdal Consta injections because, according to J.S., the CBH "was always closed" when she went there. *Id.* at 149. J.S. started receiving the injections again on January 28, 2005, when her case manager realized that J.S. had not been getting the injections.

On December 14, 2004, the CBH filed a request to continue J.S.'s regular commitment without a hearing and a periodic report regarding J.S. pursuant to Ind. Code § 12–26–15–1. The periodic report provided that J.S. "lacks judgment into taking her medication appropriately. She lacks insight into her mental illness and does not seem to be accepting of it. [J.S.] has become extremely reluctant to being medication compliant." Appellant's Appendix at 14. The periodic report also alleged: "[J.S.] suffers from a psychiatric disorder which causes her to be reluctant to taking the medication that will control it. When [J.S.] does not take her medication, she decompensates very quickly, has a history of injuring herself, becomes paranoid and sometimes violent." *Id.*

The trial court granted CBH's request and ordered that CBH provide another periodic report not later than January 28, 2006. At J.S.'s request, the trial court held a hearing on the matter. After the hearing, the trial court entered findings of fact and conclusions thereon as follows:

\* \* \* \* \*

7. Jerry Neff, M.D., psychiatrist on the staff of [CBH], testified that:

a. the [CBH's] services in this case were in accordance with professional practices and appropriate for [J.S.'s] needs.

b. [J.S.] has a history of psychiatric issues since age 17.

c. [J.S.] is suffering from a mental illness which disturbs her thinking, her behavior, her feelings, and will impair her ability to function in the absence of medication.

d. When [J.S.] fails or refuses to take her medication, she distrusts her family, believes her family is mentally ill, and believes she is the only rational person.

e. [J.S.] has a history of anger.

f. [J.S.] has reported she was a government test subject and had a device implanted in her head.

g. [J.S.] has reported being a government spy; believed people were trying to kill her; and reported leading politicians consulted her on a variety of subjects.

h. [J.S.] had been non-compliant in taking her medication, Risperdal, prior to the filing of the Request to Continue the Regular Commitment and Forced Medication Order.

i. [J.S.'s] failure to comply with the medication order will result in her eventual decomposition and a return to the hospital as occurred in December 2003—January 2004, and three times prior to that.

j. [J.S.] has persistent, uncontrolled seizures.

k. [J.S.'s] guardian and her neurologist were both consulted prior to the Risperdal order and agreed with it.

l. He had formed an opinion, prior to the Risperdal order, that this medication would be of substantial benefit in treating [J.S.'s] condition by lowering the intensity of her paranoia, and he continues to so believe based on the effects of the medication on [J.S.].

m. It is possible, explaining how, for an individual, such as [J.S.], to fail to take her medication for a period of time, such as here, and not evidence any negative effects from being non-compliant, during the time she was non-compliant.

n. He believes any possible side effects or risk of harm, and [J.S.'s] personal concerns, are outweighed by the possible benefits of this medication.

o. He has not seen nor has he been advised of any adverse effects of this medication to [J.S.] other than by [J.S.] herself.

p. He has not been advised by any professional involved with [J.S.'s] care that this medication has caused an increase in [J.S.'s] seizures; nor has he been advised by [J.S.'s] neurologist to discontinue or modify the Risperdal injections.

q. He has considered alternative forms of treatment and medications and believes Risperdal is the best and least restrictive medication for [J.S.'s] condition at this time.

r. He is of the opinion that, as in the past, [J.S.] will become gravely disabled and/or dangerous to herself or others if she is allowed to refuse her medication and subsequently decompensates, which will, in fact, occur.

8. Prior to commitment, [J.S.] at one time lost 10 to 20 pounds because she stopped eating, fearing that her food was poisoned; washed her hands repeatedly until they were dry, red and cracked; exhibited limited insights

into her finances; blocked the door of her apartment, not allowing her Case Manager to leave; and became involved in a physical altercation with neighbors and made verbal threats to treatment staff and her family.

9. [J.S.'s] mother testified that she agrees that the Regular Commitment and Forced Medication Order should be continued as [J.S.'s] psychosis has improve dramatically since the medication was ordered.

10. No evidence, except for [J.S.'s] testimony, was presented to contradict Dr. Neff's testimony that [J.S.] is mentally ill and will become gravely disabled and/or dangerous to herself or others if allowed to discontinue her medication.

11. No evidence was presented from [J.S.'s] neurologist that the number or severity of [J.S.'s] seizures has increased since she started taking Risperdal. [J.S.] testified that her seizures have increased. Dr. Neff opined that [J.S.] has feigned seizures.

12. The Court finds that [J.S.] is mentally ill; that [J.S.] does not acknowledge her mental illness; that [J.S.] has failed to comply with the Forced Medication Order, and that the medication is needed to ameliorate the effects of [J.S.'s] mental illness.

13. The Court further is of the opinion that if [J.S.] merely is required to participate in an out-patient program without the structure provided by a regular commitment and, in the absence of a Forced Medication Order, [J.S.] would not maintain her program of medication and, consequently, would become a danger to herself or others.

IT IS THEREFORE ORDERED that the Request to Continue the Regular Commitment and Forced Medication Order be and is hereby Granted.

Appellant's Appendix at 7–10.

## I.

The first issue is whether the evidence is sufficient to sustain the trial court's commitment order. When reviewing a challenge to sufficiency of the evidence, we look to the evidence most favorable to the trial court's decision and all reasonable inferences drawn therefrom. *In re Commitment of G.M.*, 743 N.E.2d 1148, 1150–1151 (Ind.Ct.App.2001) (citing *Commitment of J.B. v. Midtown Mental Health Center*, 581 N.E.2d 448, 449 (Ind. Ct.App.1991), *trans. denied*). If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible. *Id.* at 1151.

In general, there are three types of commitments. An emergency detention limits the detention of an individual to seventy-two hours. Ind.Code §§ 12–26–5–1 to –12. A temporary commitment may be authorized for up to ninety days. Ind. Code §§ 12–26–6–1 to –11. "A regular commitment is the most restrictive form of involuntary treatment and is proper for an individual whose commitment is expected to exceed ninety days." *In re Commitment of R.L.*, 666 N.E.2d 929, 930 n. 3 (Ind.Ct.App.1996); Ind.Code §§ 12–26–7–1 to –5. A regular commitment is at issue here.

In commitment proceedings, the petitioner is "required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind.Code § 12–26–2–5(e). Here, the trial court found that: "No evidence, except for [J.S.'s] testimony, was present-

ed to contradict Dr. Neff's testimony that [J.S.] is mentally ill and will become gravely disabled and/or dangerous to herself or others if allowed to discontinue her medication." Appellant's Appendix at 9. The trial court then concluded that J.S. was mentally ill and that "in the absence of a Forced Medication Order, [J.S.] would not maintain her program of medication and, consequently, would become a danger to herself or others." *Id.* at 10.

J.S. does not challenge the trial court's determination that she is mentally ill. Rather, she challenges the trial court's determinations that she is dangerous and gravely disabled.

## A.  *Dangerous.*

"Dangerous" is defined as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." Ind.Code § 12–7–2–53. According to J.S., the evidence does not support the trial court's conclusion that she would become a danger to herself or others if allowed to stop taking her medication. We agree.

Dr. Neff testified the "primary risk is not from direct aggressive behavior to others or deliberate intent to harm herself." Transcript at 75–76. Rather, his "primary concern" was grave disability. *Id.* at 113. He testified that "the risk as far as immediate danger to others or self by intentional acts are much less of a concern." *Id.* Dr. Neff was unaware of any aggression to the level of criminal activity and testified that J.S. had not been suicidal. *Id.* at 113–114.

Dr. Neff did testify that J.S. could "feel she is being assaulted or manipulated in inappropriate ways and could lash out against someone," such as when J.S. blocked the case manager from leaving her house in 2001. *Id.* at 76. However, we

agree with J.S.'s argument that "Dr. Neff's vague 'lashing out' assertion and the blocked door episode do not come close to the threshold of dangerousness ...." Appellant's Brief at 18. The CBH presented no evidence of a substantial risk that J.S. would harm herself or others. Thus, the trial court's finding that J.S. would become dangerous to herself or others if allowed to stop taking her medication was not supported by clear and convincing evidence. *See, e.g., Commitment of L.W. v. Midtown Comm. Health Center,* 823 N.E.2d 702, 704 (Ind.Ct.App.2005) (holding that there was no indication in the record that the patient was dangerous to himself or others).

## B.  *Gravely Disabled.*

██  "Gravely disabled" is defined as:

[A] condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

(1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or

(2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Ind.Code § 12–7–2–96.  J.S. argues that she is not gravely disabled and that she is "quite capable of functioning independently" both on and off of her antipsychotic medicine. Appellant's Brief at 20.

The evidence presented at the hearing reveals that J.S. is resistant to taking her antipsychotic medications. Dr. Neff opined that the "major factor" in J.S.'s repeat hospitalizations has been her failure to take her medication. Transcript at 72. Her hospitalizations occur as a result of "significant psychotic symptoms, particularly paranoid delusions" and loss of weight because of a "fear of food and

medications becoming contaminated or deliberately poisoned." *Id.* at 69. The paranoid delusions also involve J.S.'s belief that she has been persecuted, experimented on, and harassed by her family, government agencies, and national security officers.

In 2001, J.S. was involuntarily hospitalized because she refused to take her medicine because she believed that it had been poisoned and because she refused to eat and lost a significant amount of weight. In late 2003 and early 2004, J.S. again refused to eat because she thought that her food was being poisoned, and her CBH case manager found that J.S. had not been taking her oral Risperdal. Dr. Neff testified that "in the absence of a commitment and at least at this time a continuation of the forced medication order, [J.S.] will inevitably discontinue treatment and decompensate resulting in her grave disability." *Id.* at 77.

J.S. points out that she regularly takes her numerous seizure medications, that she maintains her own household, and that she functioned very well between October 1, 2004 to January 28, 2005, when she refused to get her Risperdal Consta injections. However, Dr. Neff testified that, because she is taking the Risperdal Consta, she is not currently gravely disabled. Further, Dr. Neff testified that, although J.S. apparently did not suffer any symptoms between October 2004 and January 2005, he had "no doubt or reservation that given sufficient time[,] a period of several months, there would be no question that she would manifest severe serious symptoms of a mental illness which would lead to her becoming gravely disabled." *Id.* at 115. Additionally, J.S.'s case manager testified that, although J.S. did not relapse during the time that she stopped taking medication, she could relapse next time. As to the possibility of a relapse and the significance of her time without the Ris-

perdal, the trial court found Dr. Neff's explanation of J.S.'s lack of symptoms to be more credible and entitled to more weight. J.S. essentially requests that we reweigh the evidence and judge the credibility of the witnesses, which we cannot do. *G.M.*, 743 N.E.2d at 1150–1151.

Evidence was presented that J.S. does not believe she is mentally ill and does not want to take the Risperdal Consta. When she stops taking the medication, she has, historically, had significant psychotic symptoms. From the evidence presented, we conclude that J.S. is "in danger of coming to harm" because she has "a substantial impairment or an obvious deterioration of [her] judgment, reasoning, or behavior that results in [her] inability to function independently." I.C. § 12–7–2–96(2). Furthermore, the evidence presented also reveals that, without the medication, J.S. is "in danger of coming to harm" because she will be unable to provide for her food and other essential needs. I.C. § 12–7–2–96(1). The trial court's finding that J.S. is gravely disabled is supported by clear and convincing evidence. *See, e.g., G.M.*, 743 N.E.2d at 1151 (holding that the patient was gravely disabled and dangerous); *Golub v. Giles*, 814 N.E.2d 1034, 1039 (Ind.Ct.App.2004) (holding that the patient was gravely disabled), *trans. denied.*

Ind.Code § 12–26–2–5(e) required CBH to prove that J.S. is either dangerous or gravely disabled. Although we hold the trial court finding that J.S. is dangerous to be in error, we affirm the finding that J.S. is gravely disabled. Consequently, based upon J.S.'s grave disability, the trial court's commitment order represents a conclusion that a reasonable person could have drawn. *See, e.g., G.M.*, 743 N.E.2d at 1151–1152.

## II.

■ The next issue is whether the evidence is sufficient to sustain the trial court's forced medication order. The Indiana Supreme Court has addressed the issue of forced medication with antipsychotic drugs.

The Indiana statutory scheme providing for judicial review of a proposed treatment plan when a patient objects to the course of treatment is constitutionally sufficient to satisfy the due process requirement of a judicial hearing by an independent decision maker to evaluate the competing interests reflected. I.C. § 16–14–1.6–7.[2] At that hearing, the State has the burden of proof, by clear and convincing evidence, *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), to establish the necessity of medication with anti-psychotic drugs.

In order to override a patient's statutory right to refuse treatment, the State must demonstrate by clear and convincing evidence that: 1) a current and individual medical assessment of the patient's condition has been made; 2) that it resulted in the honest belief of the psychiatrist that the medications will be of substantial benefit in treating the condition suffered, and not just in controlling the behavior of the individual; 3) and that the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient. At the hearing, the testimony of the psychiatrist responsible for the treatment of the individual requesting review must be presented and the patient may present contrary expertise.

Equally basic to court sanctionable forced medications are the following three limiting elements. First, the court must determine that there has been an evaluation of each and every other form of treatment and that each and every alternative form of treatment has been specifically rejected. It must be plain that there exists no less restrictive alternative treatment and that the treatment selected is reasonable and is the one which restricts the patient's liberty the least degree possible. Inherent in this standard is the possibility that, due to the patient's objection, there may be no reasonable treatment available. This possibility is acceptable. The duty to provide treatment does not extend beyond reasonable methods. Second, the court must look to the cause of the commitment. Some handicapped persons cannot have their capacities increased by anti-psychotic medication. The drug therapy must be within the reasonable contemplation of the committing decree. And thirdly, the indefinite administration of these medications is not permissible. Many of these drugs have little or no curative value and their dangerousness increases with the period of ingestion. The court must curtail the time period within which they may be administered. If a patient does not substantially benefit from the medication, it should no longer be administered.

If after the hearing brought about by the objecting patient has taken place, the court is convinced that the State has met its burden of proof of showing, by clear and convincing evidence, a professional judgment having the above recited qualities and characteristics, it should sanction the forced medication. If it is not so convinced, it should reject such treatment.

**2.** Repealed by Pub.L. No. 2–1992, § 897 (emerg. eff. Feb. 14, 1992); *see now* Ind.Code §§ 12–27–5–1, 12–27–5–2, 12–27–6–2, 12–27–6–3.

*In re M.P.*, 510 N.E.2d 645, 647–648 (Ind. 1987).

J.S. argues that the trial court's order providing for her forced medication with antipsychotic drugs fails to comply with the Indiana Supreme Court's requirements set out in *M.P.* Specifically, J.S. argues: (A) the trial court's order allows the indefinite forced administration of the medication; (B) the trial court failed to evaluate alternative treatments; and (C) the probable benefits of the medication are outweighed by the risks of harm.

## A. Indefinite Forced Administration.

As noted above, the Indiana Supreme Court held in *M.P.* that:

[The] indefinite administration of these medications is not permissible. Many of these drugs have little or no curative value and their dangerousness increases with the period of ingestion. The court must curtail the time period within which they may be administered. If a patient does not substantially benefit from the medication, it should no longer be administered.

*M.P.*, 510 N.E.2d at 648. Here, in January 2004, the trial court ordered J.S.'s commitment and the forced administration of the medication and did not specify a time period for the forced administration of the medications. However, Ind.Code § 12–26–15–1(a) requires the annual review of such commitment orders and provides:

At least annually, and more often if directed by the court, the superintendent of the facility or the attending physician including the superintendent or attending physician of an outpatient therapy program, shall file with the court a review of the individual's care and treatment. The review must contain a statement of the following:

(1) The mental condition of the individual.

(2) Whether the individual is dangerous or gravely disabled.

(3) Whether the individual:

  (A) needs to remain in the facility; or

  (B) may be cared for under a guardianship.

In December 2004, the CBH filed a request to continue J.S.'s regular commitment without a hearing, a periodic report regarding J.S., and a treatment plan summary. The trial court granted CBH's request and ordered that CBH provide another periodic report not later than January 28, 2006.[3] J.S. requested a hearing pursuant to Ind.Code § 12–26–15–3,[4] and after the hearing, the trial court ordered that J.S.'s commitment and forced medication order continue but did not mention a deadline for the forced medication.

By statute, J.S.'s commitment and forced medication order are not indefinite. While it would have been better for the trial court to include the periodic report deadline in its latest commitment and forced medication order, the statutory review requirement exists regardless of whether the trial court's order mentions it.

---

**3.** In fact, after the notice of appeal was filed in this case, CBH filed another periodic report on December 7, 2005, and the trial court ordered that J.S. be "recommitted to [CBH] for continued custody, care, or treatment until the patient has been discharged or until the Court terminates the commitment." Appellant's Appendix at 20. The trial court also ordered CBH to submit another periodic report by March 1, 2006.

**4.** Ind.Code § 12–26–15–3(a) provides:

Upon receiving a copy of the court order, the individual or the individual's representative may request a hearing for review or dismissal of the commitment or order concerning the therapy program. The right to review of the regular commitment or therapy order is limited to one (1) review each year, unless the court determines that there is good cause for an additional review.

Thus, we conclude that the trial court's order does not authorize the indefinite forced administration of medication.

## B. *Alternative Treatments.*

██ As noted above, the Indiana Supreme Court held in *M.P.* that:

> [T]he court must determine that there has been an evaluation of each and every other form of treatment and that each and every alternative form of treatment has been specifically rejected. It must be plain that there exists no less restrictive alternative treatment and that the treatment selected is reasonable and is the one which restricts the patient's liberty the least degree possible. Inherent in this standard is the possibility that, due to the patient's objection, there may be no reasonable treatment available. This possibility is acceptable. The duty to provide treatment does not extend beyond reasonable methods.

*M.P.,* 510 N.E.2d at 647–648.

The trial court found that Dr. Neff testified that he "considered alternative forms of treatment and medications and believes Risperdal is the best and least restrictive medication for [J.S.'s] condition at this time." Appellant's Appendix at 9. According to J.S., Dr. Neff "did not discuss the types of alternative treatments he had considered, the benefits of those alternatives when compared to Risperdal Consta, or the specific reasons for rejecting the alternatives." Appellant's Brief at 26.

Dr. Neff testified that the Risperdal Consta "is the safest and most effective way that [J.S.] can be maintained in a community setting at this time." Transcript at 78. Dr. Neff also testified that the oral form of Risperdal had previously been prescribed, but J.S. refused to take her medication and "there are some safety superiorities to the Risperdal Consta compared to the oral medication for someone with [J.S.'s] seizure history." *Id.* at 77.

Dr. Neff considered alternative treatments but thought that Risperdal was the safest effective treatment available at this time. He acknowledged that other antipsychotic drugs were available but believed the Risperdal Consta was the best option.

It is clear from the evidence that other alternatives to the Risperdal Consta were considered, but J.S. demonstrated an unwillingness to take oral medications. While it would have been helpful for Dr. Neff to recite and discuss the other treatment options, we conclude that the evidence is clear and convincing that other alternatives have been considered and rejected. *See, e.g., G.M.,* 743 N.E.2d at 1152 (noting that the psychiatrist discussed "various medications and which would best serve" the patient and determined that "Haldol, along with an antidepressant, would be the best treatment").

## C. *Benefits vs. Risks.*

██ As noted above, the Indiana Supreme Court held in *M.P.* that "the State must demonstrate by clear and convincing evidence that ... the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient." *M.P.,* 510 N.E.2d at 647. In *M.P.,* the Court noted that many side effects of antipsychotic drugs exist, including "the virtually undisputed allegation that a person medicated with anti-psychotic drugs has a 50% risk of contracting tardive dyskinesia, a disease exemplified by twisting tongue movements, puffing of cheeks, smacking of lips, sucking movements of mouth, and face and body movements characterized by continuous or rocking motions, tremors and bizarre postures, and other symptoms . . . ." *Id.* at 646.

Here, the trial court found that J.S. had benefited from the Risperdal Consta and that no side effects had been demonstrated. J.S. argues that the trial court's findings are erroneous because the benefits of

the Risperdal Consta were speculative given her lack of symptoms during the time she refused to take the medication. Moreover, J.S. argues that the Risperdal Consta caused harm to her because it exacerbated her seizure disorder.

As for the benefits of the medication, Dr. Neff, J.S.'s case manager, and J.S.'s mother each testified that the Risperdal Consta has improved J.S.'s condition. As noted above, Dr. Neff testified that, although J.S. apparently did not suffer any symptoms between October 2004 and January 2005, he had "no doubt or reservation that given sufficient time a period of several months, there would be no question that she would manifest severe serious symptoms of a mental illness which would lead to her becoming gravely disabled." Transcript at 115. Additionally, J.S.'s case manager testified that, although J.S. did not relapse during time that she stopped taking medication, she could relapse next time. Historically, when J.S. stops taking her medication, she has eventually relapsed.

As for the harm caused by the Risperdal Consta, the trial court found: "No evidence was presented from [J.S.'s] neurologist that the number or severity of [J.S.'s] seizures has increased since she started taking Risperdal. [J.S.] testified that her seizures have increased. Dr. Neff opined that [J.S.] has feigned seizures." Appellant's Appendix at 9–10. J.S. and her boyfriend testified that the Risperdal has increased her seizures. On the other hand, Dr. Neff testified that, although Risperdal Consta should be used cautiously in patients with a history of seizures, he had no evidence that the Risperdal has increased J.S.'s seizure activity. He testified that he had received medical records of a May 2004 hospital stay in which J.S. was receiving Risperdal Consta and her anticonvulsive medications were tapered. Dr. Neff testified that J.S. did not have

any seizures during this time. Dr. Flint, J.S.'s neurologist, has not advised Dr. Neff to discontinue or modify the Risperdal Consta. Further, Dr. Neff has diagnosed J.S. with a factitious disorder with physical and psychological symptoms, in which J.S. has faked seizures and dyskinesia, and believes that J.S.'s reported increase in seizure activity is not credible.

The trial court found Dr. Neff's testimony regarding the benefits and harm of the Risperdal Consta to be more credible than J.S.'s testimony. J.S. essentially asks that we reweigh the evidence and judge the credibility of the witnesses, which we cannot do. We conclude that the trial court's determination that the benefits of the medication outweigh the harm is reasonable and is supported by clear and convincing evidence. *See, e.g., G.M.,* 743 N.E.2d at 1152–1153 (holding that the patient did not present any evidence indicating that he suffered any substantial side effects from the Haldol and did not rebut the doctor's conclusion that the benefits of taking the Haldol outweighed the risks).

Although the trial court's conclusion that J.S. is dangerous is not supported by clear and convincing evidence, we affirm the trial court's conclusion that J.S. is gravely disabled. Further, the trial court's forced medication order meets the guidelines set out by the Indiana Supreme Court in *M.P.,* 510 N.E.2d at 647–648. Thus, the trial court's order for commitment and forced medication are reasonable and supported by clear and convincing evidence.

For the foregoing reasons, we affirm the trial court's order granting commitment and forced medication.

Affirmed.

RILEY and BARNES, JJ., concur.