**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Jul 10 2012, 9:35 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW G. GRANTHAM**
Bowers, Brewer, Garrett & Wiley, LLP
Huntington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**STEPHANIE ROTHENBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

|  |  |
|---|---|
| IN THE MATTER OF THE INVOLUNTARY COMMITMENT OF R.T. | ) ) ) ) No. 35A02-1110-MH-1088 ) ) |

APPEAL FROM THE HUNTINGTON CIRCUIT COURT
The Honorable Thomas M. Hakes, Judge
Cause No.  35C01-9903-MH-127

**July 10, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

R.T. appeals the trial court's order continuing his regular commitment[1] to Logansport State Hospital ("Logansport").

We affirm.

**Issue**

The sole issue presented is whether sufficient evidence supports the trial court's decision to continue R.T.'s involuntary commitment.

**Facts and Procedural History**

While in sixth grade, R.T. was placed in the Gibault School for Boys after three incidents of sexually abusing children. Three and one-half years later, R.T. was placed in juvenile detention due to an allegation that he had sodomized a fifteen-year-old male resident of Gibault.

In March of 1999, the State petitioned for R.T.'s involuntary commitment. The attached psychological evaluation showed that R.T. exhibited "significant predatory capabilities" and "clearly represent[ed] a threat to society." (App. at 28.) The recommendation was for placement in the long-term inpatient facility at Logansport that focuses on treatment of violent predatory sexual offenders. On April 7, 1999, the trial court granted the petition for involuntary commitment. Since May of 1999, R.T. has been hospitalized at Logansport. Each year from 2001 through 2009, Logansport filed an annual

---

[1] The most restrictive form of involuntary treatment, a regular commitment is appropriate when an individual's commitment is reasonably expected to require custody, care or treatment in a facility for more than ninety days. Ind. Code § 12-26-7-1; J.S. v. Ctr. For Behavioral Health, 846 N.E.2d 1106, 1111 (Ind. Ct. App. 2006), trans. denied.

report with a treatment plan summary and each year the trial court ordered continued regular commitment without a hearing.[2]

In March of 2010, R.T. filed a request for review or dismissal of his commitment. Counsel was appointed and, after a hearing, the trial court ordered an evaluation of R.T. Dr. Douglas Morris, the attending physician, submitted an amended periodic report listing eighteen recent incidents of "inappropriate behaviors" evidencing dangerousness to others and/or grave disability. (App. at 16-18.) On June 15, 2010, the trial court ordered R.T.'s continued commitment.

On March 11, 2011, Logansport again filed its Periodic Report on Regularly Committed Patient and Treatment Plan Summary with a recommendation that R.T. remain in the facility. The report lists R.T.'s mental condition as "Narcissistic Personality Disorder and History of Pedophilia." (App. at 12.) Dr. Morris opined that R.T. "[p]resents a substantial risk that [he] is dangerous to others" and that he is "gravely disabled." (App. at 12.) On March 14, 2011, the trial court issued an order continuing regular commitment. On April 19, 2011, R.T. filed a request for dismissal of his commitment. The trial court appointed counsel to represent R.T. and ordered evaluation reports to be submitted to the court prior to the

---

[2] Pursuant to Indiana Code Section 12-26-15-1(a), the superintendent or attending physician must file with the court, at least annually or more often if directed, a review of the patient's care and treatment, including a statement regarding the individual's mental condition, whether the individual is dangerous or gravely disabled, and whether the individual needs to remain in the facility or may be cared for under a guardianship. In re Commitment of J.W.B., 921 N.E.2d 513, 516 (Ind. Ct. App. 2010). Upon receipt of the report, the court shall do one of the following: (1) order the individual's continued custody, care and treatment in the appropriate facility or therapy program; (2) terminate the commitment or release the individual from the therapy program; or (3) conduct a hearing under IC 12-26-12 ["Notice of Discharge of an Individual"]. I.C. § 12-26-15-2(a); Commitment of J.W.B., 921 N.E.2d at 516.

hearing, which commenced on August 2, 2011, and concluded on August 9, 2011. On October 11, 2011, the trial court ordered that R.T. "shall remain in the facility as he remains gravely disabled and is a substantial risk of being dangerous to others." (App. at 9.) This appeal ensued.[3]

**Discussion and Decision**

Standard of Review

R.T. challenges the trial court's order for continued involuntary commitment. When reviewing the sufficiency of the evidence supporting an involuntary commitment, we look only to the evidence most favorable to the trial court's decision and all reasonable inferences drawn therefrom. M.Z. v. Clarian Health Partners, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005), trans. denied. We do not reweigh the evidence or judge the credibility of witnesses. In re Involuntary Commitment of A.M., 959 N.E.2d 832, 835 (Ind. Ct. App. 2011). If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, we affirm the order even if other reasonable conclusions are possible. Id. (citations omitted).

Civil commitment, however, is a significant deprivation of liberty and, thus, it requires due process protections. Id. An individual may be involuntarily committed in Indiana only if the petitioner proves by clear and convincing evidence that (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual

---

[3] The State provides an updated Chronological Case Summary which shows that, on February 21, 2012, Logansport filed another periodic report on R.T.'s commitment. On February 27, 2012, the court ordered regular commitment without a hearing. (Supp. App. at 6.)

is appropriate. Ind. Code § 12-26-2-5(e); In re Involuntary Commitment of A.M., 959 N.E.2d at 835. As a corollary, "[t]he court shall order the discharge of a committed individual and terminate the commitment if the court finds that the individual is not mentally ill and either dangerous or gravely disabled." I.C. § 12-26-12-7.

## Analysis

"Mental Illness" for purposes of Indiana Code Article 12-26, means "a psychiatric disorder that: (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function. The term includes mental retardation, alcoholism, and addiction to narcotics or dangerous drugs." Ind. Code § 12-7-2-130. Here, R.T. was diagnosed as having a Narcissistic Personality Disorder[4] and Pedophilia. R.T. argues that, even if he has a mental illness, there is insufficient evidence to continue his commitment on the basis that he is either dangerous or gravely disabled. We consider each in turn.

*1. Dangerous*

"'Dangerous" means "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." Ind. Code § 12-7-2-53. The trial court found that R.T. "remains violent" and "remains a predatory sexual offender." (App. at 9.)

---

[4] Dr. Morris described narcissistic personality disorder as "a chronic personality style that deals with lack of empathy towards others, a sense of self importance and grandiosity where he often feels what he wants to do is more important than following rules, than . . . treating people with respect . . . ." (Tr. at 19.)

The evidence favorable to the judgment shows that, in June of 2010, R.T. asked to be placed into a more restrictive ward. He was moved there in August of that year. R.T. testified that he requested the transfer due to his "verbal threats to staffs [sic] jobs" and because he believed the more restrictive setting "was the best thing" for him at the time. (Tr. at 70, 71.) Despite the more restrictive placement, in the months leading to the hearing, R.T. had two restrictions for physical aggression. On one occasion he kicked a staff member in the back of the leg, causing her to fall. The injury prevented the staff member from working on active duty for a number of weeks. In another incident, R.T. required restraint because he became combative with staff.

Although these incidents illustrate violence, R.T.'s dangerousness has "typically revolved around his risk of . . . engaging in . . . pedophilia" and inappropriate sexual behavior. (Tr. at 9.) R.T. admitted, "[W]hen I would have the feelings of loneliness, boredom, I would sexually act out with other clients." (Tr. at 79.) In addition R.T. had not completed the hospital's sexual responsibility program, designed to lessen problems related to pedophilia. See Commitment of T.S. v. Logansport State Hosp., 959 N.E.2d 855, 856 (Ind. Ct. App. 2011) (affirming the denial of a patient's request to be removed from the sexual responsibility program), trans. denied. Although R.T. knows the general program content, he does not practice those concepts and principles. For example, R.T. had recently made an inappropriate phone call to a patient at another state hospital where there was a sexually inappropriate discussion. He also admitted that, in April of 2011, he was "having

6

issues" with an eighteen-year-old male who looked as if he were twelve or thirteen years old. (Tr. at 73.)

Yet, R.T. asserts that the evidence reveals "no clearly illegal sexual behavior." Appellant's Br. at 9. He also argues that extreme self-centeredness, standing alone, does not make him a substantial risk to others, and he suggests that his behavior is no more than a "rational and informed decision to engage in conduct entailing a risk of harm." Appellant's Br. at 8 (quoting Commitment of J.B. v. Midtown Mental Health Ctr., 581 N.E.2d 448, 452 (Ind. Ct. App. 1991), trans. denied). In effect, R.T. asks that we reweigh the evidence, which we may not do.

The record does indicate that R.T. has made progress and that Dr. Morris was considering transitioning him to a less restrictive facility. See In re Commitment of J.W.B., 921 N.E.2d 513, 516 (Ind. Ct. App. 2010) (holding that the authority to decide where an individual should receive treatment and the responsibility for that decision rest with the superintendent of the facility). One of the physician's "chief concerns," however, was that R.T. not lose his civil commitment and be released into the community with no supervision and no mental health treatment. (Tr. at 25.) Dr. Morris believed that sexual risks remain and that R.T. still has an inappropriate attraction to young males, whom R.T. referred to as "jailbait." (Tr. at 17.) On this record, a reasonable person could have drawn the conclusion that R.T. requires commitment because, as a result of mental illness, he presents a substantial risk that he will harm others.

## 2. Gravely Disabled

> "Gravely disabled", for purposes of IC 12–26, means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

I.C. 12-7-2-96.

R.T. relies on K.F. v. St. Vincent Hospital & Health Care Center, 909 N.E.2d 1063 (Ind. Ct. App. 2009), for the proposition that the mere potential for odd or offensive behavior is insufficient to support a conclusion that an individual cannot independently function because of mental illness. K.F. involved an active sixty-two-year-old woman who had been married for more than forty years when she began exhibiting unusual behaviors, including frequenting a local bar, maxing out a new credit card, and getting into multiple car accidents. She was diagnosed with bipolar disorder but did not want to take her medication or avoid alcohol. Id. at 1065. K.F. appealed the order for her involuntary regular commitment. A review of the hearing record showed that relatives gave conflicting testimony regarding K.F.'s ability to function independently; the physician's testimony was equivocal on that issue; and her husband testified that he was willing and able to support her outpatient therapy. Id. at 1066-67. Thus, our Court reversed the order for commitment, finding insufficient evidence that K.F. was gravely disabled. Id. at 1067.

K.F. is distinguishable. First, although R.T. is capable of dressing and feeding himself, there were questions about whether he could provide for other basic needs, i.e., procuring a house or entering into a rental contract. And, unlike in K.F., there is no evidence to demonstrate that R.T. would have the necessary support system to meet those needs in the community. R.T. testified that he would be "asking my mom" to live with her for a time and he had a "couple of ideas of summer jobs like mowing." (Tr. at 74, 76.) R.T.'s plans and "ideas" for meeting essential human needs are tentative at best.

Further, unlike the physician in K.F., here, without equivocation, Dr. Morris testified that R.T. met the commitment criteria based upon grave disability. Specifically, Dr. Morris opined that R.T.'s judgment is impaired enough that he would have difficulty functioning independently. He elaborated: "[R.T.'s] inappropriate comments, his emotional maturity and his difficulty getting along with people, his difficulty following rules would leave me to have concerns that he does not that . . . he has substantial impairments in his judgment that would cause him to have difficulty functioning in the community." (Tr. at 30.) A reasonable person could have concluded that R.T.'s commitment should continue because, as the result of mental illness, he was gravely disabled. Thus, we affirm the trial court's commitment order.

Affirmed.

ROBB, C.J., and MATHIAS, J., concur.